1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY MEEKS, | CASE NO. 1:03-CV-6700-REC-LJO-P |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION |
| v. | FOR SUMMARY JUDGMENT BE GRANTED |
| K. ALLISON, et al., | (Doc. 30) |
| Defendants. | |
| _____/ | |

I.    Defendants' Motion for Summary Judgment

        A.    Procedural History

        Plaintiff Gary Meeks ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on plaintiff's complaint, filed November 26, 2003, against defendants Allison, DeGeus, Parsons, and Klarich ("defendants") for acting with deliberate indifference to plaintiff's medical and dental needs, in violation of the Eighth Amendment.  (Doc. 7.)  On April 8, 2005, defendants filed a motion for summary judgment. (Docs. 30-36.)  Plaintiff filed an opposition on June 22, 2005,[1] and defendants filed a reply on July 11, 2005.[2]  (Docs. 43, 47.)

///

---

[1] Plaintiff's opposition in the court's electronic file was originally missing pages 3 and 4.  After court staff obtained a complete copy of the opposition from the Attorney General's Office, clerk's office staff located the missing pages.  The opposition has been re-scanned so that court's electronic file contains a complete opposition.

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on May 11, 2004.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 10.)

1    B.    Legal Standard

2    Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

3    as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

4    Civ. P. 56(c).  Under summary judgment practice, the moving party

5              [A]lways bears the initial responsibility of informing the district court
               of the basis for its motion, and identifying those portions of "the
6              pleadings, depositions, answers to interrogatories, and admissions on
               file, together with the affidavits, if any," which it believes
7              demonstrate the absence of a genuine issue of material fact.

8    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

9    burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

10   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

11   Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

12   motion, against a party who fails to make a showing sufficient to establish the existence of an

13   element essential to that party's case, and on which that party will bear the burden of proof at trial.

14   Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

15   case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

16   should be granted, "so long as whatever is before the district court demonstrates that the standard

17   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

18   If the moving party meets its initial responsibility, the burden then shifts to the opposing

19   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

20   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

21   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

22   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

23   material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586

24   n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

25   might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

26   U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

27   (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

28   ///

2

1  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

2  (9th Cir. 1987).

3        In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

7  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9  amendments).

10       In resolving the summary judgment motion, the court examines the pleadings, depositions,

11 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).

12 The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

13 inferences that may be drawn from the facts placed before the court must be drawn in favor of the

14 opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

15 (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

16 party's obligation to produce a factual predicate from which the inference may be drawn.  Richards

17 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

18 Cir. 1987).

19       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

20 that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

21 could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

22 trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

23       C.     Discussion

24              1.     Plaintiff's Allegations

25                     a.     Defendant Parsons

26       In his complaint, plaintiff alleges that he was physically assaulted on January 5, 2002, at

27 Centinela State Prison ("Centinela").  (Doc. 1, Comp., Attach. C, pg. 1.)  Plaintiff alleges he was

28 admitted to the prison's infirmary and then transported to an outside hospital on January 6, 2002.

1   (Id.) Plaintiff alleges he was examined by defendant Parsons, a physician, on January 7, 2002, and

2   diagnosed with "multiple contusions to right face; right maxillary comminuted fractures; right orbital

3   wall fracture; right superior maxillary sinus fracture, nasal fractures; right maxillary plate fracture;

4   laceration sutured to left upper eyelid and lip; with hypertension." (Id.)  Plaintiff alleges he was

5   discharged from the infirmary on February 19, 2002, and had his teeth bars removed on or around

6   March 9, 2002.  (Id.)

7        Plaintiff alleges that on or around March 10, 2002, he and defendant Parsons discovered the

8   treatment he received on January 6, 2002, did not work.  (Id.)  Plaintiff alleges he was unable to eat

9   and was suffering from severe pain from his injuries.  (Id.)  Defendant Parsons reviewed plaintiff's

10  x-rays and noted that the fractures still existed, along with other problems.  (Id.) Plaintiff alleges that

11  he was not given a liquid diet, and defendant did not request funding for surgery to correct plaintiff's

12  injuries or other treatment.  (Id.)  Plaintiff alleges that he was left to suffer pain from March 2002

13  to June 18, 2002,  was not given a liquid diet and lost weight as a result, and was unable to sleep at

14  night due to the severe pain.  (Id.)

15       Plaintiff alleges that CDC dentists lacked the skills to treat plaintiff's condition, and

16  defendant Parsons, who had been informed that plaintiff was endorsed for transfer to another

17  institution, refused to place a medical hold on plaintiff so that he could be treated at an outside

18  hospital.  (Id.)  Plaintiff alleges that a referral was finally made on June 11, 2002, but  plaintiff was

19  transferred to the California Substance Abuse Treatment Facility ("SATF") on June 19, 2002.  (Id.,

20  Attach. C, pgs. 1-2.)

21                          b.    Defendant DeGeus

22       Plaintiff alleges that on May 5, 2002, while still at Centinela, he submitted a CDC 1824 form

23  (Request for Reasonable Modification or Accommodation).  (Id., Attach. B.)  Defendant DeGeus

24  rejected plaintiff's request on the grounds that the claimed disability was not permanent and it did

25  not substantially limit a major life function.  (Id.)  Plaintiff alleges that as a result of defendant's

26  actions, treatment to lessen his pain was further delayed, and he suffered a weight loss as a result.

27  (Id.)

28  ///

4

1          c.   <u>Defendants Allison and Klarich</u>

2          Plaintiff alleges that after his arrival at SATF on June 19, 2002, he informed a nurse that he

3   was in severe pain from the injuries he sustained on January 5, 2002.  (<u>Id</u>., Attach. D, pg. 1.)

4   Plaintiff alleges he did not see a doctor until thirty days later, at which time he was prescribed

5   ibuprofen and  Resource, a liquid diet, for thirty days.  (<u>Id</u>.)  Plaintiff alleges that ibuprofen did not

6   lessen his pain and he was never given the Resource, causing him to lose even more weight.  (<u>Id</u>.)

7          In late July or early August of 2002, non-party Dr. Loaiza ordered that plaintiff be seen by

8   the Chief Dental Officer.  (<u>Id</u>.)  Plaintiff alleges that the order was ignored and on August 28, 2002,

9   he filed his third request to be seen by the dentist.  (<u>Id</u>.)  Plaintiff was informed that inmates were

10  seen on a first come first served basis.  (<u>Id</u>., Attach D, pg. 2.)  Plaintiff alleges that as a result of the

11  delay, his teeth deteriorated further, loosening and causing him pain when he brushed his teeth or

12  ate.  (<u>Id</u>.)  Plaintiff filed an inmate appeal directed to non-party Dr. Salama, the Chief Medical

13  Officer, but he refused to address it and sent it over to the dental department.  (<u>Id</u>.)

14         On September 24, 2002, approximately ninety days after plaintiff arrived at SATF, he was

15  seen by a dentist, who prescribed something for an infection that had set into plaintiff's gums.  (<u>Id</u>.)

16  On October 24, 2002, plaintiff was sent to an outside oral surgeon, who conducted more x-rays and

17  other tests, but did not treat plaintiff.  (<u>Id</u>.)  Plaintiff alleges that the surgeon noted the January 6,

18  2002, surgery had been botched, informed Dr. Salama of the seriousness of plaintiff's condition, and

19  set forth two treatment options.  (<u>Id</u>.)  The first option involved stabilizing the fracture and the

20  second, less expensive option involved simply extracting plaintiff's teeth.  (<u>Id</u>.)

21         Plaintiff alleges that he was again seen by the dental department on October 22, 2002, at

22  which time he discovered staff believed surgery had been done on October 4, 2002.  (<u>Id</u>.)  On

23  October 24, 2002, plaintiff signed the first treatment plan, which involved treating the fracture.  (<u>Id</u>.)

24         On November 8, 2002, defendant Allison, the acting Chief Medical Officer, authorized that

25  no action be taken on plaintiff's inmate appeal, which requested immediate treatment for his severe

26  pain, because plaintiff and a dentist had agreed on a plan.  (<u>Id</u>., Attach A.)  Plaintiff alleges that

27  defendant Allison knew he was unable to eat, chew, or brush his teeth, was suffering severe pain,

28  had lost twenty pounds in four months, and had collapsed on November 6, 2002, due to lack of

5

nutrition. (Id.) Plaintiff alleges that defendant intentionally undermined his effort to obtain relief for his pain. (Id.)

Plaintiff alleges that on January 8, 2003, defendant Klarich responded to his inmate appeal, noted the seriousness of plaintiff's condition and the pain he had suffered, and granted the appeal. (Id., Attach D, pg. 2.) Plaintiff alleges that for budgetary reasons, defendant would not authorize funding for the treatment plan recommended by the oral surgeon and consented to by plaintiff. (Id.) Plaintiff alleges that defendant Klarich was aware of the pain plaintiff was suffering but refused to authorize treatment. (Id.)

        2.    Undisputed Facts

          a.    Defendant Parsons

1.    Defendant Parsons graduated from San Diego State University in 1977 with a B.A. degree in chemistry, and from University of California Riverside in 1984 with an M.A. degree in physiological psychology. In 1985, defendant Parsons obtained a public school teaching credential from University of California Los Angeles. Defendant Parsons graduated from the Saint Louis University School of Medicine in 1992 with his Doctor of Medicine degree. Defendant Parsons is a medical doctor licensed by the Medical Board of California to practice medicine since 1994. Defendant Parsons completed an internal medicine residency program at Martin Luther King Medical Center in Los Angeles in 1995. Defendant Parsons was employed by the California Department of Corrections (CDC) at Centinela State Prison from May of 1999 until August of 2004. While at Centinela, defendant Parsons worked for 4 years as the appointed Chief Physician and for 3 years as the elected Chief of the Organized Medical Staff. In August of 2004, defendant Parsons resigned employment at Centinela and began work as an internal medicine physician at Clinicas de Salud del Pueblo in Calexico, California, his current site of employment.

2.    Defendant Parsons is familiar with the standard of care in the field of general internal medicine.

3.    Plaintiff arrived at Centinela on February 10, 1999, and was assaulted on January 5, 2002, while in the exercise yard of Administrative Segregation (Ad-Seg). Plaintiff sustained facial

trauma and Centinela staff physician Dr. William Smith had plaintiff promptly transferred for an ER evaluation at Pioneer's Hospital in Brawley. Following a facial CT scan which revealed multiple facial fractures, the ER physician at Brawley had plaintiff transferred over 100 miles to the plastic surgery service ("plastics") at the University of California San Diego (UCSD) late in the evening of January 5, 2002. Surgery occurred at UCSD on the morning of January 6, 2002. The diagnoses on the operative report include "minimally displaced zygomatic fracture, right maxillary alveolar segment fractures, minimally displaced nasal fractures." Prior to January 5, 2002, plaintiff was already missing multiple teeth. Fixation of the mouth fractures was achieved with the use of upper and lower Brich bars and wires. Dr. Dobke's report concludes with the phrase, "The patient will be kept with IMF for a period of four to six weeks, after which the patient is to seek dental care, restorative dental surgery, plus revisonary maxillary, mandibular, and facial surgeries as needed and warranted at the time."

4.     Plaintiff's case was brought to defendant Parson's attention on January 7, 2002. Defendant Parsons was the admitting physician for plaintiff into Centinela's Central Health Inpatient Area.

5.     Defendant Parsons admitted plaintiff to the infirmary very late at night on January 7, 2002. Plaintiff presented with a history of multiple facial fractures and a placement of an intermaxillary fixation. Defendant Parsons ordered that plaintiff be checked at every shift for 24 hours and then every day as routine thereafter. Defendant Parsons placed plaintiff on a liquid diet only, and prescribed Resource by mouth three times per night and Tylenol #3 by mouth every four hours as needed for pain. Defendant Parsons also added Perdex at 30cc's swish and spit three times per night and an order to follow up in the a.m.

6.     On January 8, 2002, defendant Parsons increased the amount of Resource, requested that the Utilization Review Committee inform him when a follow-up with USDC plastics would occur, and ordered that plaintiff's sutures should come out on approximately January 12, 2002. Defendant Parsons noted that plaintiff was admitted after an apparent assault that occurred in Ad-Seg on January 5, 2002, where he was hit on the right side of his face. It was

7

purported that plaintiff had contusions, nasal and maxillary fractures, and facial lacerations. These had been repaired at UCSD. When plaintiff presented, his vitals were in the normal range and his mouth was wired.

7. Defendant Parsons again saw plaintiff on January 9, 2002, for a follow-up examination. Plaintiff's vitals were within the normal range. The exam noted that plaintiff had wired jaws and was tolerating his liquid blended diet. Plaintiff was to continue under current management. Defendant Parsons again noted that plaintiff's sutures on the left eyebrow and lip were to be removed on approximately January 12, 2002, and sent a note to the Utilization Review Committee regarding plaintiff's follow-up appointment with UCSD.

8. Defendant Parsons again saw plaintiff on January 10, 2002, and noted that plaintiff was stable.

9. On January 14, 2002, defendant Parsons again saw plaintiff, and noted a slight improvement in plaintiff's facial edema and that plaintiff continued to eat a blended diet due to the wired jaws. Defendant Parsons again noted for the Utilization Review Committee to clarify follow-up with UCSD appointment, and that plaintiff would continue on his current management.

10. Defendant Parsons saw plaintiff for follow-ups on January 15, 16, and 17, and noted that his condition was unchanged.

11. On January 22, 2002, defendant Parsons saw plaintiff again, and noted that he was awaiting a dental appointment for his complaints that his wires were loose.

12. On January 23, 2002, defendant Parsons saw plaintiff again when he presented after having been to UCSD that same day. Plaintiff had been sent to UCSD after he had complained of loose wiring in his jaw. When plaintiff returned, defendant Parsons noted that his wiring was intact.

13. On January 24, 2002, defendant Parsons again saw plaintiff for follow-up and noted that his condition was stable. Defendant Parsons signed a consult to the Utilization Review Committee to clarify plaintiff's next appointment with UCSD and to follow up with Correctional Sergeant Rodriguez regarding plaintiff's need for reading glasses.

14. On January 28, 2002, defendant Parsons saw plaintiff again for follow-up and noted that he was scheduled for referral to UCSD that same week. Plaintiff had no complaints and his vitals and weight were stable. Defendant Parsons again attempted to obtain plaintiff's reading glasses.

15. On January 29, 2002, defendant Parsons again saw plaintiff and noted that he was stable with his dental wiring intact. Defendant Parsons ordered liquid Tylenol by mouth to occur.

16. On January 30, 2002, defendant Parsons ordered the optometry clinic to obtain new glasses for plaintiff. Plaintiff had presented that day with his condition as stable and awaiting his next appointment to UCSD plastics to assess his dental wiring and maxillary fractures.

17. On January 31, 2002, plaintiff presented complaining of lumbar spine and left hip pain. Defendant Parsons noted that plaintiff had a pending appointment for follow-up with UCSD plastics, and ordered an x-ray of plaintiff's lumbar spine and left hip. According to the x-ray, plaintiff had ongoing degenerative disk disease in his lower spine and possible injury to his left hip.

18. On February 1, 2002, plaintiff presented to Chief Dental Officer Ross Peters, who noted some loose wiring in plaintiff's jaw.

19. Defendant Parsons next saw plaintiff when plaintiff presented on February 4, 2002, stating that the pain in his right maxillary area was improving and that his wires were somewhat loose. Defendant Parsons followed up with the Utilization Review Committee regarding plaintiff's next UCSD plastics appointment and attempted to locate glasses for him.

20. On February 5, 2002, defendant Parsons again saw plaintiff when plaintiff presented with no new complaints and defendant Parsons noted that plaintiff was to see UCSD Plastic Services the following day regarding his jaw wires loosening. Plaintiff was seen on February 6, 2002, at UCSD Plastics Services regarding his loose wiring and when defendant Parsons saw him that same day, he had no new complaints.

21. On February 8, 2002, plaintiff received his glasses.

22. On February 19, 2002, defendant Parsons saw plaintiff for a follow-up. Defendant Parsons noted that plaintiff was able to chew and did not have much dental pain. Defendant Parsons

9

1  and medical staff, in consultation with plaintiff, decided to discharge plaintiff from the
2  inpatient area and return him to Ad-Seg that same day.  Defendant Parsons wrote a formal
3  consult to the utilization management nurse requesting clarification of the date of plaintiff's
4  next follow-up appointment with UCSD.

5  23.   Defendant Parsons next saw plaintiff on March 5, 2002, when he noted that plaintiff's
6  condition was stable.

7  24.   Plaintiff returned to UCSD on March 6, 2002, for a follow-up.

8  25.   Defendant Parsons saw plaintiff again on March 7, 2002, for a follow-up.  Defendant Parsons
9  ordered Peridex mouthwash and pain medications, and submitted a consult request to the
10  Utilization Review Committee to clarify if plaintiff needed a follow-up at UCSD.

11  26.   Plaintiff was seen by staff dentist Dr. Gary Cummings on March 14, 2002, who noted that
12  plaintiff's teeth appeared displaced and that he expected this issue to be addressed at the next
13  UCSD follow-up.

14  27.   Defendant Parsons again saw plaintiff on April 2, 2002, where he noted that the UCSD
15  follow-up appointment had not occurred and that plaintiff needed to be seen by the chief
16  dental officer, and requested consults with the surgery clinic regarding a nodule above
17  plaintiff's umbilicus and with podiatry.

18  28.   On April 15, 2002, Dr. Brazell ordered a repeat CT scan of the facial bones.

19  29.   The facial CT scan occurred on May 20, 2002.  The radiologist's report from Pioneer's
20  Hospital indicated that the fractures were healing.  Since the fractures were described as
21  improved and healing, no urgent response was elicited from staff physician Dr. Esperanza,
22  who signed off on the x-ray report.  While there was a delay in obtaining the CT scan, this
23  was due to custodial scheduling problems and transportation limitations.  The medical staff
24  have no control over these issues, as they are controlled exclusively by custodial staff.

25  30.   On June 4, 2002, defendant Parsons ordered plaintiff to return in one week to go over CT
26  scan results and determine the need for yet another UCSD plastics referral.

27  31.   On June 11, 2002, defendant Parsons did not see plaintiff, but after being informed by Candi
28  Cook, an appeals coordinator, that plaintiff was still having problems with his mouth,

1    defendant contacted MTA Leals in Ad-Seg, who informed defendant that plaintiff still had

2    problems with loose teeth.  On June 11, 2002, defendant Parsons again contacted the

3    utilization management nurse to set up what would have been plaintiff's sixth appointment

4    at UCSD.  Defendant Parsons learned that plaintiff was being transferred to Corcoran and

5    on June 18, 2002, noted in the progress notes, "We were in the process of sending back to

6    UCSD Plastics because although recent facial scan showed improvement, in facial fractures

7    on right, right upper teeth still wiggle and fracture of right maxilla appears loose.  Needs

8    further follow-up of this problem (ENT/Plastics referral)."  Plaintiff was transferred to the

9    California Substance Abuse Treatment Facility and State Prison-Corcoran ("SATF") on or

10   around June 19, 2002.

11                    b.    Defendant DeGeus

12   32.  Douglas DeGeus is employed by the CDC as an appeals coordinator at Centinela.  In this

13        position, defendant DeGeus's duties included being familiar with the Americans with

14        Disabilities Act (ADA).  Defendant DeGeus attended ADA training at the ADA Conference

15        in Dunbar, California from August 22 to August 23, 2001, and attended two 2-day training

16        sessions on inmate appeals on April 9-10, 2002 and May 9-12, 2002, both of which included

17        training in the ADA.  Defendant DeGeus reviews CDC 1824 forms, so he must be familiar

18        with the ADA.  These forms are used by inmates with disabilities to request a reasonable

19        modification or accommodation which, if granted, would enable them to participate in

20        programs offered at the institution for which they are otherwise qualified to participate.

21   33.  On or about May 6, 2002, defendant DeGeus received a CDC 1824 form from plaintiff.

22        Plaintiff requested money damages for pain and suffering for what plaintiff thought was an

23        unreasonable delay in providing adequate medical care.

24   34.  Since plaintiff was seeking money rather than an accommodation, defendant DeGeus

25        believed that plaintiff's request was inappropriate.  Defendant DeGeus did not have the

26        authority to grant plaintiff's request, and returned the request to plaintiff with a written

27        response.  Defendant DeGeus forwarded a copy of his CDC form 823 to the institution's

28        medical section so that they would be alerted to the complaints about medical care.

1    Defendant DeGeus provided his response on a CDC Inmate/Parolee Screening Form, which

2    he completed on May 6, 2002, as part of his duties as the appeals coordinator.

3                            c.    Defendant Allison

4    35.   Defendant Kathleen Allison is currently employed by the CDC as an Associate Warden at

5          SATF. At all times relevant to plaintiff's complaint, defendant Allison was the Correctional

6          Health Service Administrator II.   In that position, defendant Allison was responsible for

7          reviewing all inmate appeals at the first level.   Defendant Allison's other duties included

8          Health Care Manager (acting).   Defendant Allison is not a medical doctor.   Defendant

9          Allison has an Associates of Science degree in nursing from Pacific Union College, and is

10         trained in correctional administration/health care administration.

11   36.   On November 8, 2002, defendant Allison reviewed plaintiff's inmate appeal (CDC 602) at

12         the first level of review.  In the appeal, plaintiff requested referral back to an oral surgeon.

13         Next to defendant Allison's signature on the appeal form under "title" is "CMO (A)," which

14         means Chief Medical Officer (Acting).  Defendant Allison did not write that and believes it

15         was filled in by clerical staff at a later time.  Defendant Allison has never been the Chief

16         Medical Officer and cannot act as such because she is not a medical doctor.  After signing

17         and approving plaintiff's appeal, defendant Allison forwarded it to the reviewer for further

18         action.  This was defendant Allison's only involvement in plaintiff's case.

19                            d.    Defendant Klarich

20   37.   Defendant J. Klarich is a medical doctor licensed since June 16, 1975, by the California

21         Medical Board.  Defendant Klarich is employed at SATF and currently holds the title of

22         Health Care Manager, formerly the Chief Medical Officer.  Defendant Klarich graduated

23         from medical school on June 5, 1969, and is board certified in surgery.

24   38.   The position of HCM/CMO is administrative and involves overall responsibility for

25         supervising prison medical staff, overseeing the care and treatment of inmates-patients, and

26         investigating and responding to inmate appeals.  Although defendant Klarich was never

27         directly involved with plaintiff's medical care and treatment plan, defendant did review

28         plaintiff's inmate appeal.  In the appeal, plaintiff stated that he previously broke his jaw, that

                                                 12

1    it did not heal correctly, and that he was in pain.  Plaintiff stated he was scheduled for an

2    appointment with an oral surgeon, but had not received the appointment.  Plaintiff requested

3    to receive his appointment.  In his response to plaintiff's appeal, defendant Klarich noted that

4    according to plaintiff's medical file, plaintiff was interviewed by Dr. Fishback, DDS, on

5    October 22, 2002, at the first level of review, and again on January 7, 2003, at the second

6    level of review.  Records stated that plaintiff informed Dr. Fishback he had received an

7    appointment with an oral surgeon, and that Dr. Fishback evaluated plaintiff and confirmed

8    plaintiff had teeth extracted and treatment for the fractured jaw bone.  Records further stated

9    that plaintiff had been scheduled for additional treatment at the institution.  Plaintiff's

10    appointment to see the oral surgeon was anticipated to occur in February 2003.  In light of

11    the anticipated appointment with an oral surgeon, defendant Klarich granted plaintiff's

12    appeal at the second level of review on January 8, 2003.

13            3.     Plaintiff's Eighth Amendment Claims

14        To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

15 conditions must involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman, 452

16 U.S. 337, 347 (1981).  A prisoner's claim of inadequate medical care does not rise to the level of an

17 Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal

18 civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate

19 indifference in doing so.'"  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett

20 v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).  A prison official does not act in

21 a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to

22 inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Deliberate indifference may

23 be manifested "when prison officials deny, delay or intentionally interfere with medical treatment,"

24 or in the manner "in which prison physicians provide medical care."  McGuckin v. Smith, 974 F.2d

25 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133,

26 1136 (9th Cir. 1997) (en banc).  Where a prisoner is alleging a delay in receiving medical treatment,

27 as plaintiff is here, the delay must have led to further harm in order for the prisoner to make a claim

28 ///

1   of deliberate indifference to serious medical needs. <u>McGuckin</u>, 974 F.2d at 1060 (citing <u>Shapely</u>

2   <u>v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)).

3                            a.      Defendant Parsons

4           Defendants argue that defendant Parsons provided plaintiff with constitutionally adequate

5   medical care. (Doc. 30, Motion, p. 6.)  Defendants contend that at no time did defendant Parsons

6   delay or deny medical treatment for plaintiff that was medically necessary or warranted, and that

7   plaintiff's treatment for his facial injuries was within the community standard of care. (<u>Id</u>., 12:1-15.)

8   Defendants contend that plaintiff received medical care immediately upon being injured, and

9   although some delays occurred, they occurred due to the complexity of plaintiff's injuries, the failure

10  of plaintiff's fracture to heal properly, and the difficulties in transporting plaintiff for tests and

11  speciality consultations, none of which were within the control of medical staff.  (<u>Id</u>.)  Defendants

12  contend that with the exception of January 5, 2002, the day plaintiff was assaulted, plaintiff's

13  condition was not emergent and emergency matters take priority over routine tests.  (<u>Id</u>.)

14          In his opposition, plaintiff argues that defendants have not met their burden as the moving

15  parties because they fail to demonstrate that defendant Parsons did not have a duty to place a medical

16  hold on plaintiff so that he could make his outside appointment with UCSD. (Doc. 43, Opp., 2:16-

17  23.)   Plaintiff contends that his medical condition was serious enough to be considered an

18  emergency, that he needed the outside medical treatment, and that defendant Parsons violated his

19  rights by failing to place a medical hold on him to prevent his transfer and allow him to obtain that

20  outside treatment. (<u>Id</u>., 3:3-28.) Plaintiff alleges that as a result of defendant's failure to place a hold

21  on him, he was transferred and his medical treatment was delayed for months.  (<u>Id</u>.)

22          "Deliberate indifference is a high legal standard." <u>Toguchi</u>, 391 F.3d at 1060. "Under this

23  standard, the prison official must not only 'be aware of the facts from which the inference could be

24  drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"

25  <u>Id</u>. at 1057 (quoting <u>Farmer</u>, 511 U.S. at 837).  "'If a prison official should have been aware of the

26  risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the

27  risk.'"  <u>Id</u>. (quoting <u>Gibson v. County of Washoe, Nevada</u>, 290 F.3d 1175, 1188 (9th Cir. 2002)).

28  ///

1    The undisputed facts establish that after plaintiff was assaulted and injured on January 5,

2  2002, defendant Parsons provided plaintiff with medical treatment on numerous occasions between

3  February 7, 2002, and June of 2002, when plaintiff transferred to SATF.  (Undisputed Facts 3-31.)

4  Plaintiff has submitted no evidence that defendant Parsons knew of and disregarded an excessive risk

5  to plaintiff's health.[3]  Farmer, 511 U.S. at 834.  The conclusory assertion that defendant could have

6  placed a medical hold on plaintiff to prevent plaintiff's transfer and enable plaintiff to go to UCDS

7  for another appointment, but failed to do so does not raise a triable issue of fact with respect to

8  whether defendant Parsons acted with deliberate indifference.  As a lay person with no medical

9  training, plaintiff is not qualified to opine that his medical condition constituted a medical emergency

10  that necessitated immediate treatment.  Thus, plaintiff's opinion as to the urgency of his condition

11  and what should have been done to treat it more immediately is insufficient to raise a triable issue

12  of fact with respect to whether defendant acted with deliberate indifference to a serious medical

13  need.

14    At most, plaintiff's disagreement with his transfer from Centinela to SATF while his medical

15  issues remained unresolved constitutes a disagreement with the course of treatment provided by

16  prison officials.  This disagreement cannot support a claim of deliberate indifference under section

17  1983.  To prevail, plaintiff "must show that the course of treatment the doctors chose was medically

18  unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard

19  of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)

20  (internal citations omitted).  Plaintiff has not submitted any such evidence.  Because plaintiff has not

21  presented any evidence that defendant Parsons acted with deliberate indifference during his

22  involvement in plaintiff's medical care, defendant Parsons is entitled to judgment as a matter of law

23  on plaintiff's claim against him.

24  ────────────

25    [3] Verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment
rule if they are based on facts within the pleader's personal knowledge.  Johnson v. Meltzer, 134 F.3d 1393, 1399-

26  1400 (9th Cir. 1998).  The asserted facts must be based on an inmate's personal knowledge of admissible evidence,
and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew

27  v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).  In conjunction with its review of
defendants' motion, the court has treated plaintiff's complaint and opposition as opposing affidavits to the extent

28  possible.

1       b.    Defendant DeGeus

2       Defendants argue that defendant DeGeus did not deny or delay plaintiff's medical care.

3   (Doc. 30, Motion, 14:21.)  Defendants contend that defendant DeGeus's only involvement with

4   plaintiff concerning the allegations in the complaint was to review plaintiff's reasonable

5   accommodation request, a form request used by inmates with disabilities to request a reasonable

6   modification or accommodation which, if granted, would enable them to participate in programs

7   offered at the institution for which they are otherwise qualified to participate. (Id., 14:4-7 & 21-24.)

8       Defendants contend that on or about May 6, 2002, defendant DeGeus received a CDC 1824

9   form from plaintiff. (Id., 14:8-9.) Plaintiff requested money damages for pain and suffering for what

10  plaintiff thought was an unreasonable delay in providing adequate medical care. (Id., 14:9-11.)

11  Because plaintiff was seeking money rather than an accommodation, defendant DeGeus believed that

12  plaintiff's request was inappropriate. (Id., 14:12-15.) Defendant did not have the authority to grant

13  the request in any event, and returned the request to plaintiff with a written response on a CDC

14  Inmate/Parolee Screening Form. (Id., 14:15-20.) Defendant DeGeus then forwarded a copy of his

15  CDC form 823 to the institution's medical section so that they would be alerted to the complaints

16  about medical care. (Id.)

17      Plaintiff has submitted no evidence in support of his Eighth Amendment claim against

18  defendant DeGeus.  Plaintiff contends that his claim against defendant DeGeus is one for violation

19  of the First Amendment. (Doc. 43, Opp., 2:3-9.) This contention is addressed in subsection 4.  In

20  addition, plaintiff contends that defendant failed to produce a copy of the CDC 823 form he

21  purportedly forwarded to the medical department and that by returning plaintiff's original inmate

22  appeal form, along with the CDC 1824 form, to plaintiff rather than sending the forms to the medical

23  section, defendant delayed plaintiff's medical treatment. (Id., 6:4-19.)

24      Plaintiff must do more than attack the credibility of defendants' evidence.  See National

25  Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to

26  cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to

27  avert . . . judgment.")  Plaintiff has submitted no evidence that defendant DeGeus knew of and

28  disregarded an excessive risk to plaintiff's health.  Farmer, 511 U.S. at 834.  Defendant's mere

1   review and rejection of plaintiff's CDC 1824 form is an insufficient basis upon which to impose

2   liability under section 1983 for violation of the Eighth Amendment.  <u>Buckley v. Barlow</u>, 997 F.2d

3   494, 495 (8th Cir. 1993).  In order to raise a triable issue of fact on his claim against defendant

4   DeGeus, plaintiff is required to tender some evidence that defendant acted with deliberate

5   indifference.  Plaintiff has not done so and defendant DeGeus is therefore entitled to judgment as a

6   matter of law on plaintiff's claim against him.

7                        c.   <u>Defendant Allison</u>

8           Defendants argue that defendant Allison did not deny, delay, or interfere with plaintiff's

9   medical care.  (Doc. 30, Motion, 13:13-14.)  Defendants contend that defendant Allison's only

10  involvement in plaintiff's case was her review of plaintiff's inmate appeal on November 8, 2002,

11  at the first level of review.  (<u>Id</u>., 13:1-2 & 10-12.)  In the appeal, plaintiff requested referral back to

12  an oral surgeon.  (<u>Id</u>., 13:2-3.)  After recommending approval of plaintiff's request and signing the

13  appeal, defendant Allison forwarded it to the reviewer for further action.  (<u>Id</u>., 13:10-11.)

14          In his opposition, plaintiff contends that his claim against defendant Allison is one for

15  violation of the First Amendment.  (Doc. 43, Opp., 2:3-9.)  This issue is addressed in subsection 4.

16  Plaintiff's remaining contentions do not raise any triable issues of fact.  Plaintiff contends that

17  defendant has not submitted any credible evidence that she granted his appeal or forwarded it to the

18  reviewed for further action.  (<u>Id</u>., 5:9-19.)  Plaintiff contends that although defendant disclaimed

19  responsibility for writing "CMO (A)" on the appeal form, she failed to state that she did not date the

20  form November 8, 2002.  (<u>Id</u>., 5:20-22.)  Finally, plaintiff contends that as a nurse, defendant could

21  have put plaintiff on the doctor's line to be given a liquid diet and pain medication.  (<u>Id</u>., 5:23-28.)

22          Plaintiff has submitted no evidence that defendant Allison acted with deliberate indifference

23  by knowingly disregarding an excessive risk to plaintiff's health.  <u>Farmer</u>, 511 U.S. at 834.

24  Plaintiff's mere argument that defendant could have taken additional action when reviewing

25  plaintiff's appeal but failed to do does not constitute evidence in support of the claim that defendant

26  acted with deliberate indifference.  Further, who wrote on the appeal form that defendant Allison was

27  CMO(A) and whether the appeal was granted in full or only partially granted are immaterial to the

28  issue of whether defendant, in addressing plaintiff's appeal, acted with deliberate indifference.

1    Because there are no material issues of fact in dispute relating to whether defendant Allison knew

2    of and disregarded an excessive risk to plaintiff's health, defendant Allison is entitled to judgment

3    as a matter of law on plaintiff's claim against her.

4                    d.    Defendant Klarich

5          Defendants argue that defendant Klarich did not deny or delay any medically necessary or

6    warranted treatment, and that he was not involved with plaintiff or plaintiff's treatment other than

7    responding to plaintiff's inmate appeal. (Doc. 30, Motion, 16:9-13.) Defendants contend that in his

8    position as HCM/CMO, defendant Klarich reviewed plaintiff's documentary submissions and

9    plaintiff's medical file, and then responded to plaintiff's appeal. (Id., 15:17-19.) Defendants

10   contend that plaintiff requested to receive an appointment with an oral surgeon and in as much as

11   plaintiff was scheduled to see an oral surgeon in February 2003, defendant Klarich granted the

12   appeal. (Id., 15:22-24 & 16:4-8.)

13         In his opposition, plaintiff contends that defendant Klarich is liable because as CMO,

14   defendant headed the prison's Health Care Review Committee, which considered the treatment plan

15   submitted by Dr. Charles Nicholson via letter dated October 4, 2002. (Doc. 43, Opp., 4:1-11.)

16   Plaintiff contends that Dr. Fishbach's alternate treatment plan was formed after defendant Klarich

17   would not fund Dr. Nicholson's suggested treatment plan. (Id., 4:13-16.) Plaintiff contends that he

18   was forced to accept Dr. Fishbach's less desirable treatment plan in an effort to obtain relief for his

19   pain. (Id., 4:18-21.)

20         After a consultation on October 4, 2002, Dr. Nicholson recommended two treatment options.

21   The first treatment plan involved "root canal fillings of teeth #4, #5, #6, #7 and #8 with

22   apiccetomies, debridement and curettage of the fibrous tissue, grafting the fracture site and

23   stabilization of the fracture with internal fixation." (Exhibit A to Opp.) The second treatment plan,

24   described by Dr. Nicholson as more conservative, involved extraction of the remaining teeth and

25   construction of a maxillary denture. (Id.) Plaintiff subsequently agreed to Dr. Fishbach's plan to

26   remove teeth 4-8, allegedly because defendant Klarich refused to authorize the first, more expensive

27   treatment plan. (Doc. 35, Klarich Dec., Exhibit A, p. 5.)

28   ///

Plaintiff's contentions and the submission of the letter by Dr. Nicholson do not raise any triable issues of fact regarding whether defendant Klarich violated plaintiff's Eighth Amendment rights.  Plaintiff's own exhibit establishes that Dr. Nicholson set forth two treatment options. Plaintiff does not have a constitutionally protected right to choose between the two options, and the decision of prison officials to offer only the second treatment option to plaintiff is not grounds for the imposition of liability under section 1983.  Plaintiff has submitted no evidence "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332 (internal citations omitted).  Because plaintiff has not submitted any evidence that defendant Klarich acted with deliberate indifference to his serious medical needs by knowingly disregarding an excessive risk to plaintiff's serious medical needs, Farmer, 511 U.S. at 834, defendant Klarich is entitled to judgment as a matter of law on plaintiff's claim against him.

### 4.    First Amendment Claims Against Defendants DeGeus and Allison

In his opposition, plaintiff argues that his claims against defendants DeGeus and Allison are premised on a violation of his First Amendment right to access the courts, and his Eighth Amendment claims are only against defendants Parsons and Klarich.  Plaintiff's attempt to recast his claims against defendants DeGeus and Allison at the eleventh hour in these proceedings is rejected. First, plaintiff's complaint is utterly devoid of any facts that either give rise to cognizable claims for relief under section 1983 for denial of access to the courts or place defendants on notice that plaintiff is pursuing claims against them for denial of access to the courts. Fed. R. Civ. P. 8(a); Lewis v. Casey, 518 U.S. 343, 351 (1996) (inmate claiming interference with or denial of access to the courts must show that he suffered an actual injury).

Second, the court issued an order on April 2, 2004, which notified plaintiff that the court found his complaint contained cognizable claims for relief against all four defendants for violating the Eighth Amendment by acting with deliberate indifference to his medical and dental needs. (Doc. 7.)  To the extent that plaintiff believed in good faith that he had alleged claims for relief against defendants DeGeus and Allison in his complaint for denial of access to the court, this order placed plaintiff on notice that the court had not observed that any such claims were pled.  At no time did

1   plaintiff seek reconsideration of the order or file a motion seeking leave to file an amended

2   complaint.  The deadline for amending the pleadings was March 8, 2005. (Doc. 18.)  Plaintiff may

3   not now at this late date attempt to alter the basis of his claims in an effort to avoid summary

4   judgment. Fed. R. Civ. P. 16.  Plaintiff's argument that defendants' motion for summary judgment

5   is incomplete because it does not address his access claims is therefore rejected.

6        D.    Conclusion

7        Based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for

8   summary judgment, filed April 8, 2005, be GRANTED, thus concluding this action in its entirety.

9        These Findings and Recommendations will be submitted to the United States District Judge

10  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**

11  **days** after being served with these Findings and Recommendations, the parties may file written

12  objections with the court.  The document should be captioned "Objections to Magistrate Judge's

13  Findings and Recommendations."  The parties are advised that failure to file objections within the

14  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

15  1153 (9th Cir. 1991).

16

17  IT IS SO ORDERED.

18  **Dated:    August 25, 2005**                          **/s/ Lawrence J. O'Neill**
        b9ed48                                          UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28